**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Jul 12 2012, 8:54 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOHN ANDREW GOODRIDGE, ESQ.**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**KIMBERLY NIGHTINGALE**
Indiana Dept of Child Services
Evansville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF CHILD ALLEGED | ) | |
| TO BE A CHILD IN NEED OF SERVICES: | ) | |
| | ) | |
| D.L. (Minor Child), and K.S. (Mother), | ) | |
|     Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No.  82A05-1111-JC-628 |
| | ) | |
| THE INDIANA DEPARTMENT OF | ) | |
| CHILD SERVICES, | ) | |
|     Appellee-Petitioner. | ) | |

APPEAL FROM THE VANDERBURGH COUNTY SUPERIOR COURT, JUVENILE
DIVISION
The Honorable Renee A. Ferguson, Magistrate Judge
Cause No. 82D01-1012-JC-800

**July 12, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

K.S. ("Mother") appeals from the juvenile court's order finding her child, D.L., is a Child in Need of Services ("CHINS").[1] Mother raises a single issue for our review, whether there was sufficient evidence to support the juvenile court's order finding D.L. to be a CHINS.

We affirm.

**Facts and Procedural History**

Mother has a history of psychiatric problems, and has in the past been diagnosed with depression, bipolar disorder, and paranoid-type schizophrenia. D.L. has been the subject of two CHINS petitions prior to the present case. In the first of the prior CHINS cases, in December 2007, Mother was found standing naked in the rain holding a doll and saying the doll was D.L. In the second of the two prior CHINS cases, Mother and D.L. were found walking down a highway; Mother had incoherent speech and was unable to identify herself or D.L. Both prior CHINS petitions were related to concerns with D.L.'s welfare as a result of Mother's psychiatric conditions, and both prior cases were closed after Mother completed required services.

On December 8, 2010, Mother, brought D.L. to St. Mary's Hospital in Evansville, Indiana, and stated that D.L. had not eaten in three days and was vomiting water. Nurses and a physician, Dr. Ayim Darkeh ("Dr. Darkeh"), asked D.L. to discuss his symptoms, but

---

[1] D.L.'s father, C.L., also challenged the CHINS petition, but failed to participate at all stages of the proceedings in the juvenile court and has not filed an appeal of the CHINS adjudication or joined Mother's appeal.

Mother refused to allow D.L. to speak. At some point, Mother also complained that D.L. had "not been able to sleep in 3 years and only slept for 3 seconds in 3 years." (Ex. 5, Emergency Dep't Note at 1.)

Concerned with Mother's "weird affect" (Ex. 5, Emergency Dep't Note at 2), Dr. Darkeh requested that Meredith Bean ("Bean"), a psychological social worker at the hospital, speak with Mother and D.L. Mother also refused to allow Bean to speak with D.L., and when Bean asked Mother why she thought D.L. was not sleeping, Mother inquired why Bean was asking about D.L.'s sleep when she had brought D.L. to the hospital because of stomach problems. At the same time, Mother began to insist that hospital staff allow her to obtain food for D.L.

Bean remained in the triage room with Mother, D.L., and a nurse, and the Vanderburgh County Department of Child Services ("DCS") was eventually contacted. While waiting for staff from DCS to arrive, Bean overheard mother telling D.L. not to talk to hospital staff, that people in another room were listening in on them, and that hospital staff "don't care about you, they're here to frame me." (Tr. at 45.) When D.L. responded to questions from hospital staff, he would give inappropriate answers. As the visit got longer, Mother's paranoid symptoms worsened, and the hospital staff became concerned that D.L. would be placed in danger as a result.

At around midnight, DCS caseworker Sarah Higgs ("Higgs") arrived along with an employee of a mobile drug-testing provider. Mother submitted to a drug screen and tested positive for benzodiazepine use, though none of Mother's medical records indicate that she

3

had been prescribed such medication. Because Higgs, Bean, and other hospital employees were concerned that D.L. would be in danger if he returned home with Mother, Higgs detained D.L. and placed him in a foster home.

On December 13, 2010, DCS initiated the present CHINS action. DCS arranged for Mother to have supervised visitation with D.L. at a facility operated by Ireland Home Based Services. During these visits, Mother often interacted with D.L. in age-inappropriate ways, such as talking to then six-year-old D.L. as though he were a baby and force-feeding him. Mother also attempted to intimidate members of the supervision staff, and at times refused to leave the visitation facility after the scheduled visitation periods ended.

Prior to and during the pendency of the CHINS proceeding, Mother was a patient of Southwest Behavioral Healthcare, which provided her with psychiatric treatment. Mother asserted that she could not be required to continue to take medications prescribed by clinicians, rejected any diagnosis of a psychiatric disorder, and insisted that a thyroid disorder was the source of her perceived psychiatric problems.

After fact-finding hearings on April 15, June 13, and August 10, 2011, during which Mother and numerous social workers and other professionals offered testimony, on September 6, 2011, the juvenile court found D.L. to be a CHINS. On November 1, 2011, the juvenile court entered a Parent Participation Plan ("the Plan").

On November 29, 2011, Mother filed her notice of appeal with the juvenile court. On November 30, 2011, Mother filed an amended notice of appeal.

4

**Discussion and Decision**

On appeal, Mother argues that there was insufficient evidence to support the juvenile court's order adjudicating D.L. a CHINS. In such cases, we do not reweigh the evidence on review, but instead examine the evidence most favorable to the court's decision and draw all reasonable inferences in that same light to determine whether sufficient evidence exists to support the court's decision. In re A.S., 912 N.E.2d 840, 851 (Ind. Ct. App. 2009) (citing In re H.N.P.G., 878 N.E.2d 900, 903 (Ind. Ct. App. 2008)).

Indiana Code Section 31-34-19-10(a)(1) requires that juvenile courts enter written findings and conclusions when finding a child is a CHINS. When reviewing written findings and conclusions, we engage in a two-tiered review: we first determine whether the evidence supports the findings, and then determine whether the findings support the judgment. Id. at 851. We may not reverse the findings and conclusions of a juvenile court unless they are clearly erroneous. Ind. Trial Rule 52(A). Findings of fact are clearly erroneous when the record is devoid of any evidence or reasonable inferences in support of those findings; the judgment is clearly erroneous when unsupported by findings of fact and the conclusions relying upon those facts. In re A.S., 912 N.E.2d at 851.

DCS pursued a CHINS adjudication for D.L. under Indiana Code Section 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with

5

necessary food, clothing, shelter, medical care, education or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A)    the child is not receiving; and

(B)    is unlikely to be provided or accepted without the coercive intervention of the court.

DCS was required to prove D.L.'s CHINS status by a preponderance of the evidence. In re A.H., 913 N.E.2d 303, 305 (Ind. Ct. App. 2009) (citation omitted). The court need not wait until a tragedy occurs before intervening; parental action or inaction is sufficient to adjudicate a child as a CHINS. Id. at 306. The purpose of a CHINS adjudication is to protect the child, not to punish the child's parents. Id.

Here, DCS produced testimony from numerous case workers who oversaw Mother's visitations with D.L., each of whom testified that Mother's actions were inappropriate during the visits. Julie Johnson ("Johnson") testified that she observed Mother try to give D.L. a pill and then attempt to hide the drug when her actions were discovered. Johnson also testified that Mother would take actions to attempt to intimidate workers supervising the visitation sessions and encouraged D.L. to violate rules set forth for his safety during visitation. Mother also attempted to force-feed D.L., would chastise D.L. for not eating or drinking as much as she thought he should, and would treat D.L. like a baby during some visits. Johnson further testified that Mother would regularly refuse to leave the visitation site and required escorts from the building, and that Mother's conduct generally at visitations varied from session to session depending upon her mood.

6

Ken Scheller, who also worked as a visitation supervisor, corroborated reports of Mother's refusal to leave visitation and testified that Mother's interaction with supervision staff and D.L. during visitation periods was harmful to maintaining good parental bonding between herself and D.L. and tended to undermine D.L.'s feelings of support while in foster care. During Mother and D.L.'s initial visit, Tara Nally, another visitation supervisor, testified that Mother told D.L. that the visitation center staff was trying to kill him and starve him, and that the social workers had kidnapped him. At the end of the visit, Mother attempted to block exits to prevent D.L. from leaving.

Corrine Howell ("Howell") of DCS testified that DCS's goal was to reunify Mother and D.L., but that so long as Mother's psychiatric condition was unstable, her erratic behavior posed supervisory problems and possible physical risks to D.L. Dr. Sean Samuels ("Dr. Samuels"), a psychologist who diagnosed Mother's psychiatric status for DCS, testified that mother's failure to take medication would result in Mother's gradual psychological decompensation, leaving her less capable of providing support and supervision for D.L. Bean testified that during the visit to the emergency room with D.L., which gave rise to these proceedings, Mother exhibited clear signs of paranoia, and this is consistent with Dr. Samuels's diagnosis of Mother having paranoid-type schizophrenia. Dr. Samuels and Howell both testified that Mother's failure to maintain her use of medications caused them significant concern about D.L.'s safety with Mother. Howell testified that this would be the case even if Mother's problems were a result of a thyroid disorder, for which Mother testified that she had pursued treatment but which apparently resulted in no treatment plan.

7

Thus, there was sufficient evidence supporting the juvenile court's order finding D.L. a CHINS. To the extent Mother now directs our attention to her contention that a thyroid condition is responsible for her psychiatric symptoms, her argument requests that we reweigh the evidence before the juvenile court, which we cannot do. Because we conclude that there was sufficient evidence to support the court's conclusion that D.L. is a CHINS, we affirm the court's order.

Affirmed.

ROBB, C.J., and MATHIAS, J., concur.